UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JANE DOE,

Plaintiff,

v.

LIVANTA LLC AND STEVEN H. STEIN,

Defendants.

---

**MEMORANDUM AND ORDER**
20-CV-4264

LASHANN DEARCY HALL, United States District Judge:

Plaintiff Jane Doe filed a motion for a temporary restraining order ("TRO") on

September 11, 2020, seeking to enjoin Defendant Livanta LLC ("Livanta") from affirming the

decision of a skilled nursing facility ("SNF") to discharge her to at-home care.  (Pl.'s Mot. TRO,

ECF No. 4.)  On September 13, 2020, the Court denied Defendant's motion.  (Mem & Order,

ECF No. 6.)  On September 17, 2020, Plaintiff  filed a motion an "Emergency Stay of an Order

Denying Plaintiff's Motion for a Temporary Restraining Order."  (Pl.'s Reconsid. Mot, ECF No.

9.)

## BACKGROUND

### I.      Factual Background

Defendant Livanta is a Quality Improvement Organization ("QIO"),which hears appeals

by Medicare recipients of discharge determinations by health care facilities in New York State.[1]

(Compl. ¶¶ 8-9; 20.)  Defendant Stein serves as Livanta's medical director.  (*Id.* ¶ 10.)  Plaintiff

---

[1] Livanta is a Beneficiary and Family Centered Care Quality Improvement Organization (BFCC-QIO).  *See*
https://www.livantaqio.com/en/About/BFCC-QIO (Accessed Sept. 23, 2020).  BFCC-QIOs "handle cases in which
beneficiaries want to appeal a health care provider's decision to discharge them from the hospital or discontinue
other types of services."  *See* https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-
Instruments/QualityImprovementOrgs (Accessed Sept. 23, 2020).

is a 79-year-old Medicare beneficiary.  (*Id.* ¶ 7.)  Plaintiff previously resided in an in-patient

rehabilitation facility and is alleged to suffer from medical conditions requiring neuro-muscular

rehabilitation.  (*Id.* ¶¶ 13, 15.)

On June 11, 2020, Plaintiff was admitted to Maimonides Medical Center (the

"Hospital"), for treatment of a septic bone infection related to a bed sore.  (*Id.* ¶ 14.)  On June 24,

2020, the Hospital "sought to discharge" Plaintiff to a SNF.  (*Id.* ¶ 17.)  Plaintiff requested that

Livanta conduct an expedited review of the Hospital's decision to discharge Plaintiff to an SNF

as opposed to an in-patient rehabilitation facility.  (*Id.* ¶¶ 20, 23.)  In support of her request,

Plaintiff submitted 49 pages of written evidence to Livanta.  (*Id.* ¶¶ 21-22.)  On June 26, 2020,

Livanta affirmed the Hospital's discharge determination and found that Plaintiff was liable for

hospital costs as of  June 27, 2020 at noon.  (*Id.* ¶ 23-24.)  According to Plaintiff, Livanta's

evaluation was limited to Plaintiff's bone infection related to her bed sore and did not evaluate

her ongoing need for other rehabilitation.  (*Id.* ¶ 26.)

On June 27, 2020, Plaintiff requested an expedited reconsideration of the Hospital's June

24, 2020 discharge determination.  (*Id*. ¶ 28)  Upon reconsideration, on June 29, 2020, Livanta

again affirmed the Hospital's decision.  (*Id.*  ¶¶ 28-29.)  Plaintiff was discharged from the

Hospital and admitted to the SNF the same day.  (*Id.*  ¶ 35.)

On July 3, 2020, Plaintiff appealed Livanta's June 29, 2020 decision on the expedited

reconsideration to the Office of Medicare Hearings and Appeals ("OMHA").  (*Id.* ¶ 36.)  Before

the OMHA, Plaintiff argued that  "Livanta QIO arbitrarily disregarded the incompleteness of

[Hospital]'s planning for [Jane Doe]'s 'postdischarge care' for rehabilitative services[.]"  (*Id.* ¶

36 (modifications in original).)  On August 19, 2020, a hearing was held before an OMHA

administrative law judge ("ALJ").  (*Id.* ¶ 40.)  The ALJ found that the Hospital was liable for

costs from June 27, 2020 until Plaintiff was discharged from the Hospital on June 29, 2020.  (*Id.*

¶ 43.)  The ALJ made no findings with respect to Plaintiff's need for neuro-muscular

rehabilitation.  (*Id.* ¶ 44.)

On September 2, 2020, Plaintiff's health care proxies were notified by the SNF that she

would be discharged on September 14, 2020 to stay-at-home care.  (*Id.* ¶ 46.)  Plaintiff's

discharge was subsequently delayed to September 17, 2020.  (*See* 9/18/20 Hearing Tr. at 22:21-

24, Draft on file with Chambers.)  Plaintiff appealed the SNF's decision to discharge Plaintiff to

at-home care to Livanta on September 17, 2020 arguing that the SNF failed to properly consider

Plaintiff's need for neuro-muscular rehabilitation.  (Aff. Supp. Mot. Reconsideration TRO ("Pl.'s

Aff") ¶ 12, ECF No. 10.)  Livanta affirmed the SNF's decision to discharge Plaintiff on

September 18, 2020.  (*Id.* ¶ 13.)

## II.      Procedural History

On September 11, 2020, Plaintiff filed a complaint against Livanta and Stein pursuant to

42 U.S.C. § 1983 alleging deprivation of her constitutional rights.  (Compl. ¶ 1.)  More

specifically, Plaintiff alleged that she was denied due process in connection with the expedited

review and reconsideration of the "hospital-initiated discharge" because "Defendants had a duty

to impose liability on Hospital for any failure to arrange for Jane Doe's post-discharge

rehabilitation care needs, less a possible grace period of at most two (2) days beyond such

failure."  (Compl. ¶ 52.)  As alleged in the complaint, Defendants knowingly and willfully

omitted discussion of Plaintiff's rights to post-discharge rehabilitation care in their decisions to

affirm the Hospital's discharge decision.  (*Id.* ¶ 53.)  Further,  Defendants "knowingly and

willfully disregard[ed] the invalid nature of the of the Detailed Notice of Discharge that the

hospital issued[.]"  (*Id.* ¶ 54.)

3

Plaintiff also sought a motion for a temporary restraining order.  (Pl.'s TRO Mot.)

Plaintiff argued that the Hospital's June 24, 2020 discharge decision posed an immediate threat

of harm to Jane Doe."  (Pl.'s Mot. TRO ¶ 50.)  As such, Plaintiff requested that the court enjoin

Defendants from issuing any determination affirming Plaintiff's discharge from the SNF to at-

home care.  (*Id.* at 13.)

Although Plaintiff had cast her complaint as one brought pursuant to § 1983, in her

memorandum of law in support of the temporary restraining order, Plaintiff made no mention of

§ 1983, nor did she advance any argument that she had met the elements of any claim.  (*See* Pl.'s

Mot. TRO.)  Instead, to support her request, Plaintiff relied primarily on the Supreme Court's

determination in *Blum v. Yaretsky*, 457 U.S. 991 (1982), that "the threat of facility-initiated

discharges or transfers to lower levels of care is sufficiently substantial that respondents have

standing to challenge their procedural adequacy… at the instance of one who is himself

immediately harmed, or immediately threatened with harm, by the challenged action."  (*Id.* ¶ 48.)

On September 13, 2020, the Court denied Plaintiff's motion for a TRO.  (Mem & Order,

ECF No. 6.)  In denying the TRO, the Court focused on the lack of potential merit of Plaintiff's §

1983 claim and declined to address the myriad of other deficiencies within Plaintiff's filings.

Ultimately, the Court found that Plaintiff would be unable to show that "the conduct at issue

[was] committed by a person acting under color of state law."  (Mem & Order 3.)  The Court

noted that Plaintiff's quoted language from *Blum* was taken from the Supreme Court's discussion

on standing.  (*Id.*)  But as to the question of state action, the *Blum* court found that nursing

homes' decisions to discharge or transfer particular patients do not constitute state action because

those decisions "ultimately turn on medical judgments made by private parties according to

4

professional standards that are not established by the State." (Mem & Order 4 (citing *Blum,* 457

U.S. at 1008).)  The Court found no reason to reach a different conclusion in this case.

On September 15, 2020, Plaintiff filed a notice of appeal to the Second Circuit.  (ECF

No. 8.)  Then, on September 17, 2020, Plaintiff filed an "Emergency Stay of an Order Denying

Plaintiff's Motion for a Temporary Restraining Order."  (ECF No 9.)  That same day, the Court

held an ex-parte status hearing.  (9/17/20 Minute Entry and Order.)  The Court indicated that it

could not undertake consideration of Plaintiff's motion at that time because, by filing a notice of

appeal, Plaintiff had divested the Court of jurisdiction over the case.  (*Id.*)  Plaintiff withdrew her

Second Circuit appeal on September 21, 2020.  (ECF No. 11.)

The Court now considers the instant motion, which it construes as a motion for

reconsideration of the order denying the TRO. [2]  (9/17/20 Minute Entry and Order.)  By her

motion, Plaintiff  "concedes that 42 U.S.C. § 1983 is inapplicable" to the instant case.  (Mem.

Law Supp. Pl.'s Mot. Reconsid. ("Pl.'s Reconsid. Mem.") 1, ECF No 9-1.)  Instead, Plaintiff

asks the Court to analyze her claim as one arising under the due process clause of the Fifth

Amendment .  Nevertheless, for the reasons set out fully below, the Court's conclusion remains

unchanged.

## DISCUSSION

### I.      Scope of Plaintiff's TRO Request

A prudent starting point is to set out the scope of Plaintiff's request for injunctive relief,

as her submission is muddled at best.  In her September 11, 2020 motion for a temporary

restraining order, Plaintiff maintained that the "Hospital's [June] discharge decision not to return

Jane Doe to an inpatient rehabilitation facility level of care posed an immediate threat of harm to

---

[2] To the extent Plaintiff maintains that the motion is in fact a motion to stay, it would be denied for the same reasons set forth in this opinion.

Jane Doe." (Pl.'s Mot. TRO ¶ 50.)  In support of the instant motion, Plaintiff now argues that

"the issue is whether Defendants' June 26, 2020 issuance of an expedited discharge

determination and June 29, 2020 issuance of an expedited discharge reconsideration constituted

'state action[s]' for purposes of the Fifth Amendment Due Process Clause." (Pl.'s Reconsid.

Mem. 3.)  Plaintiff's current position is as flawed as the first.  That is, Defendants' months-old

decisions cannot operate as a basis to find an immediate threat to Plaintiff at this juncture.

In any event, Plaintiff's initial motion for a temporary restraining order also sought to

enjoin Defendants from affirming the SNF's September 2, 2020 decision to discharge her to at-

home care. (Pl.'s Mot. TRO at 13.)  At oral argument, Plaintiff clarified that ultimately what she

seeks is for  Livanta to be required to review her entire medical record (presumably to include

issues regarding her medical conditions that require neuro-muscular rehabilitation), and for the

Court to "signal to Livanta that this has to be taken seriously." (9/18/20 Hearing Tr. at 20:2-7.)

However, and most notably, at the time of filing the TRO, on September 11, 2020, Plaintiff had

not yet appealed the SNF's discharge decision to Defendants.  Indeed, Plaintiff's appeal to

Livanta was not filed until six days later on September 17, 2020. (Pl.'s Aff. ¶ 12.)  On

September 18, 2020,  Livanta affirmed the SNF's decision. (*Id.* ¶ 13.)

## II.    Applicable Standard of Review is for a Mandatory Injunction

Preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not

be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v.*

*Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (internal quotation marks and

citation omitted).  "It is well established that in this Circuit the standard for an entry of a TRO is

the same as for a preliminary injunction." *Andino v. Fischer*, 555 F. Supp. 2d 418, 419

(S.D.N.Y. 2008).  A movant must demonstrate: "1) irreparable harm absent injunctive relief; 2)

either a likelihood of success on the merits, or a serious question going to the merits to make

them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor;

and 3) that the public's interest weighs in favor of granting an injunction." *Metro. Taxicab Bd. of*

*Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (internal citations omitted).

Importantly, there are two types of injunctive relief—prohibitory or mandatory. *N. Am.*

*Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018).

Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory

injunctions alter it. *Id.* Because mandatory injunctions disrupt the status quo, a party seeking

one must meet a heightened legal standard by showing "a clear or substantial likelihood of

success on the merits." *Id.* at 37. To determine the status quo, the Court must determine "the

last actual, peaceable uncontested status which preceded the pending controversy." *Id.*

As of the time of the filing of the motion for reconsideration, the status quo was that

Plaintiff was set to be discharged from the SNF and Plaintiff sought to enjoin Defendants from

affirming the SNF's September 2, 2020 decision to discharge Plaintiff to at-home care.

Accordingly, Plaintiff's requested relief disrupts the status quo.[3] And as such, Plaintiff must

---

[3] The status quo merits further explanation. The Court has already detailed the procedural history in this case at
length, but recounts the relevant events here. Plaintiff filed her motion for reconsideration of the Court's denial of
the TRO on September 17, 2020. (ECF No. 9.) Plaintiff had not yet been discharged at the time of her filing of the
motion for reconsideration, nor had she requested an appeal of that determination. In effect, she was requesting the
Court bar any future theoretical adverse decision by Livanta in a theoretical appeal. Only after filing her motion for
reconsideration, did Plaintiff appeal the SNF's discharge order to Livanta. (Pl.'s Aff. ¶ 12.) Livanta denied
Plaintiff's appeal of the SNF's discharge decision on September 18, 2020. (*Id.* ¶ 13.) Moreover, at the time
Plaintiff filed her motion for reconsideration, the Court was divested of jurisdiction over this case because Plaintiff
had filed an appeal of the Court's denial of the TRO in the Second Circuit on September 15, 2020. (ECF No.
8.) The USCA Mandate reflecting that Plaintiff withdrew her Second Circuit appeal was issued on September 18,
2020, but was not docketed until September 21, 2020. (ECF No. 11.) At that point, the Court regained
jurisdiction. Plaintiff has not provided the Court with an update indicating the current status of her discharge or
whether she moved for reconsideration of Livanta's September 18, 2020 decision on the appeal. Nevertheless, the
applicable standard would remain unchanged under either scenario. The status quo is either a planned discharge or
an actual discharge from the SNF. Any relief Plaintiff could obtain at this point would require a disruption of the
status quo.

meet a heightened legal standard for a mandatory injunction by showing a clear or substantial

likelihood of success on the merits.

## III.    No Clear or Substantial Likelihood of Success on the Merits

As discussed above, Plaintiff's complaint as drafted brought a claim under § 1983 against

Defendants Livanta and Stein alleging that they acted under the color of New York state law to

deprive Plaintiff of her due process rights.  Relying on *Blum* and its progeny, the Court denied

her motion for a TRO as she failed to demonstrate state action under § 1983.  (Mem & Order 3-

4.)  In her motion for reconsideration, Plaintiff concedes there is no state action under § 1983.

(Pl.'s Reconsid. Mem. 1.)  Nonetheless, Plaintiff presses that denial of her motion for a

temporary restraining order for want of state action is in error because Defendants' actions are

attributable to the federal government for purposes of a Fifth Amendment due process claim, for

the same reasons the Second Circuit found state action in *Kraemer v. Heckler*, 737 F.2d 214 (2d

Cir. 1984).[4]  (*Id.* 3-4.)  Plaintiff is wrong.

"To state a [Fifth Amendment] Due Process claim, a plaintiff must show that: (1) state

action (2) deprived him or her of liberty or property (3) without due process of law."  *Barrows v.*

*Burwell*, 777 F.3d 106, 113 (2d Cir. 2015).  A due process claim cannot lie against a private

actor unless the allegedly unconstitutional conduct is "fairly attributable to the State."  *Am. Mfrs.*

*Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50, (1999).  In other words, the due process clause

provides "no shield against merely private conduct, however discriminatory or wrongful."

*Blum*, 457 U.S. at 1002.  Of particular relevance here, the standard a court must apply to

determine whether a plaintiff has met the statutory requirement of action "under color of state

---

[4] In arguing for reconsideration, Plaintiff only argues there is state action with respect to Livanta's June 2020 decisions to affirm the Hospital's discharge determination.  (Pl.'s Reconsid. Mem. 2-4.)  The Court will construe these arguments as applying to Defendants' affirmance of the SNF's discharge decision as well.

law" pursuant to § 1983 or the "state action" requirement of a due process claim is the same. *See*

*Alexander v. Azar*, No. 3:11-CV-1703 (MPS), 2020 WL 1430089, at *43 (D. Conn. Mar. 24,

2020) (appeal filed May 22, 2020) (citing § 1983 caselaw in describing the state action

requirement for a Fifth Amendment due process claim against the Secretary of Health and

Human Services for deprivation of Medicare benefits); *see also Beverley v. Douglas*, 591 F.

Supp. 1321, 1329 (S.D.N.Y. 1984) (summarizing the relationship between the Fifth Amendment,

Fourteenth Amendment and § 1983 and collecting cases for the proposition that the same

standard is used to determine whether conduct is fairly attributable to the state under § 1983 or

the federal government under Fifth Amendment's due process clause).

In determining whether there was state action here, the Court will undertake an analytical

approach similar to the one taken in *Alexander*, 2020 WL 1430089, at *43-48, which relied

heavily on three key precedential cases – *Blum, Kraemer* and *Catanzano v. Dowling*, 60 F.3d

114 (2d Cir. 1995).  In *Alexander*, the court noted that these key precedential cases were decided

well before *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir.

2008), in which the Second Circuit articulated the compulsion, joint action, and public function

state action tests.  2020 WL 1430089, at *44.  And, because the relevant precedent dealt with

"closely analogous" issues, the *Alexander* court deemed it prudent to apply those cases to the

facts before it, rather than move mechanically through each of *Sybalski* tests.  *Id*.  This Court

agrees with the *Alexander* court's approach, as its analysis reflected the principles underpinning

the *Sybalski* tests, while at the same time allowed for the benefit of applying the Supreme Court

and Second Circuit's state action analysis to facts particularly analogous to the case at bar.

In *Blum,* the relevant issue was whether there was state action under the Fourteenth

Amendment with respect to health care facilities' decisions to transfer patients to lower levels of

care.  457 U.S. at 1012 (detailing holding applied to "nursing homes' decisions to discharge or

transfer Medicaid patients to lower levels of care").  Ultimately, the Supreme Court found that

the state is not responsible for discharge decisions by nursing homes and attending physicians in

connection with the Medicaid program so as to activate the procedural requirements of the

Fourteenth Amendment.  *Id.*  Significantly, the Court emphasized that in that case the plaintiffs

were not challenging the adjustment of benefits, but "the discharge to lower levels of care

without adequate notice or hearings."  *Id.* at 1005.  Moreover, the Court rejected arguments that

it could find state action on the basis that any discharge must comply with the Medicaid

regulatory scheme and must be reported to New York State.  *Id.* at 1007-1010.  Rather, *Blum*

found that discharge decisions made by physicians and nursing home administrators turned on

"medical judgments made by private parties according to professional standards that are not

established by the State."  *Id.* at 1008.

  *Kraemer,* decided two years later by the Second Circuit, addressed a question left open

by *Blum*—whether a Utilization Review Committee's ("URC") determination that an admission

or a continued stay in a health care facility was not a "medical necessity" under Medicare

regulations constituted state action for purposes of a due process violation.  737 F.2d at 214, 216.

Importantly, the *Kraemer* court emphasized that Plaintiffs were challenging "the adjustment of

benefits," not simply the discharge determination to lower level of care, as had been the case in

*Blum*.  *Id.* at 220.

  In evaluating whether URC decisions constituted state action, the court in *Kraemer* first

defined the role of an URC.  As explained by the court, URCs are required by statute to provide

for periodic review of the "medical necessity of the services ... [to promote] the most efficient

use of available health facilities and services...."  *Id.* at 216.  A URC decision that services are no

longer medically necessary operates effectively to terminate Medicare coverage, as Medicare

coverage is terminated within 72 hours from the date the provider receives notice of an adverse

URC decision.  *Id.*  The *Kraemer* court observed that such URC determinations are "governed

largely by statute, regulation, [] manuals, and transmittal letters."  *Id.* at 220.  Furthermore,

physician-members of URCs are required to act "in accordance with guidelines established by

the Secretary" to "select or develop written criteria and standards for reviewing the necessity for

admissions and continued stays and conducting medical care evaluation studies."  *Id.*  Finally,

the court noted that a decision by a URC "does not constitute a discharge order and does not

preclude the beneficiary from remaining in the facility or seeking alternative payment."  *Id.* at

216.  Against this backdrop, the court concluded that "there is a far stronger basis for finding

state action in the decisions of URCs which evaluate entitlement to Medicare benefits than in the

decisions of attending physicians and nursing home administrators."  *Id.* at 219.

Somehow, Plaintiff reads *Kraemer* to stand for the proposition that where any decision

relates to care covered by Medicare, it implicates state action while, as set out in *Blum*, decisions

related to care covered by Medicaid do not.  (9/18/20 Hearing Tr. at 13:22-14:10.)  Plaintiff

misapprehends the *Kraemer* decision.

The import of *Blum* and *Kraemer* may be clearer in view of their application.  For

example, in *Catanzano v. Dowling*, the Second Circuit evaluated whether certified home health

care agencies ("CHHAs") were state actors for the purposes of a due process claim.  60 F.3d 114

(2d Cir. 1995).  Under the Medicaid scheme at issue there, CHHAs performed a "fiscal

assessment" of home health care services that were prescribed by a patient's physician.  *Id.*

CHHAs were required to deny treatment prescribed by a patient's physician if the CHHA

concluded that the prescribed home health care was not medically necessary and there were ways

to deliver the care that were less expensive than home care.  *Id.* at 115-116 (detailing the

"Medical Necessity and Safety Step" and the "Economies Step" of CHHAs' process, which were

at issue on appeal). The Second Circuit found that these decisions constituted state action for

purposes of a due process claim.  *Id.* at 120.  Significantly, the Second Circuit noted that, as

in *Kraemer*, and unlike in *Blum*, the decisions made by the CHHAs were not "purely medical

judgments made according to professional standards," but involved the application of regulatory

rules.  *Id.* at 119.  The *Catanzano* court also noted that CHHAs' decisions were influenced by the

State's efforts to control costs, distinguishing them from the more independent decisions at issue

in *Blum*.  *Id.*  *Catanzano* concluded that "the State has exercised coercive power [and] has

provided such significant encouragement" that CHHA determinations could be deemed those of

the state for purposes of a due process claim.  *Id.* at 220.

 *Alexander v. Azar*, decided more recently, provides a useful application of *Blum,*

*Kraemer* and *Catanzano*.  2020 WL 1430089. There, the court confronted a situation involving

individuals who were admitted as inpatients to a hospital based on determinations made by

treating physician.  *Id.* at *1, 45.  However, during their stay, a URC reviewed the physicians'

decisions and determined that, notwithstanding the physicians' findings, the inpatients did not

qualify for Medicare Part A coverage.  *Id.* at *1, 45.  The patients' status was, therefore, changed

from "inpatient" to "observation" or "outpatient."  *Id.*  Trial evidence showed that such changes

were caused by the URC's staff applying "mandatory, nationwide standards" set by the Center

for Medicaid and Medicare Services ("CMS"), in response to "significant pressure" from the

Secretary.  *Id.*  After a searching analysis of *Blum, Kraemer*, and *Catanzano*, the *Alexander* court

found that the URC determinations were "not purely medical judgments made according to

professional standards, but involve[d] the application of a standard prescribed by CMS."  *Id.* at

*47.  Moreover, the court observed that while "this standard leaves some room for professional judgment, it is designed to closely circumscribe this judgment, and CMS expects it to be applied with a high degree of consistency." *Id.*  Accordingly, the *Alexander* court found that "when a hospital URC causes a patient's status to be changed to observation, CMS has provided such significant encouragement that the URC's conduct is fairly attributable to the state[.]" *Id.* at *48.

Here, the Court generously construes Plaintiff's arguments to suggest a theory that the appeals process of the SNF's discharge decision—which is handled by Livanta—is analogous to a URC's decision to effectively withdraw Medicare coverage.  However, the Court is not persuaded that Plaintiff has demonstrated a clear or substantial likelihood that this theory is viable.  Here, there is a medical determination, made by the SNF, that Plaintiff is ready for discharge.  In that way, the gravamen of the complaint is a "medical judgment made by private parties according to professional standards that are not established by the State." *Blum,* 457 U.S. at 1008.  That Livanta manages any appeal of a facility's medical decision to discharge, and must operate in accordance with Medicare regulations, does not transform Defendants into state actors.  *See id.* at 1004 ("The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State[.] . . . The complaining party must also show that there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." (internal quotations and citations omitted)).

Plaintiff, while she argues otherwise, is not challenging the adjustment of her benefits, like the plaintiffs in *Kraemer, Catanzano* or *Alexander* as she has included no allegations in her complaint or subsequent filings that support a finding that Defendants are making determination about her Medicare coverage.  *See, e.g., Kraemer,* 737 F.2d at 219 ("It appears that there is a far

13

stronger basis for finding state action in the decisions of URCs which evaluate entitlement to

Medicare benefits than in the decisions of attending physicians and nursing home

administrators."). Likewise, there are no plausible allegations that any state actor is influencing

Livanta's decision. *See Catanzano*, 60 F.3d at 119; *Alexander,* 2020 WL 1430089 at \*1, 45.

Furthermore, in stark contrast to *Kraemer, Catanzano* or *Alexander*, where medical

determinations by physicians were overruled or changed, here, Livanta is affirming the medical

decision of the SNF. *See, e.g., Catanzano*, 60 F.3d at 115-116 (discussing that CHHAs denied

home health care treatment prescribed by a physician if certain criteria were met). That

Defendants' decision to affirm a discharge from the SNF means "that the [federal government]

responds to such actions by adjusting benefits does not render it *responsible* for those actions."

*Blum*, 457 U.S. at 1005 (emphasis in the original). As such, as this Court previously held, there

is not a clear or substantial likelihood that the Court would find state action, a requisite for any

due process claim.[5]

---

[5] Even if Plaintiff could show state action, she has not shown a clear or substantial likelihood she would succeed on her due process claim. Plaintiff argues that Defendants have failed to comply with Medicare regulations that protect her due process rights. (*See, e.g.,* Pl.'s Aff. ¶ 14.) But her allegations do not support such a finding. Plaintiff's views were solicited during Livanta's appeal process as required by 42 C.F.R. § 405.1206(d)(4), as she submitted a twelve page letter in support of her appeal, which included medical evidence. (Pl.'s Aff., Ex 1, ECF No. 10-1.) She was apprised of Livanta's decision. (Pl.'s Aff. ¶ 13.) While she alleges that the appeal determination did not convey that Defendants had reviewed all of Plaintiff's medical records, (Pl.'s Aff. ¶¶ 16-17), she did not identify any regulation that Defendants violated in failing to issue a fulsome explanation for their determination, nor any caselaw that would support a finding that such an omission constitutes a due process violation. By way of comparison, *Kraemer* and *Alexander* found that URC determinations violated plaintiffs' due process rights because they included no procedural safeguards. *See Kraemer,* 737 F.2d. at 222 ("Neither the patient nor her or his family [were] notified [of the URC's decision], much less given the opportunity to submit evidence or arguments."); *Alexander*, 2020 WL 1430089, at \*50 (D. Conn. Mar. 24, 2020) ("As an initial matter, at present, the Plaintiffs are currently entitled to no procedural safeguards whatsoever."). To be sure, there may be a situation in which some procedural protections were afforded, but a due process claim could lie. This is not that case. At bottom, the thrust of Plaintiff's complaint appears to be that she disagrees with the outcome of Livanta's appeal process. As such, she has failed to meet her burden of persuasion that there a clear and substantial likelihood of success on the merits of a due process claim.

15

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for reconsideration of the Court's denial of a

temporary restraining order is DENIED.

SO ORDERED.


Dated:  Brooklyn, New York                          /s/ LDH
        September 24, 2020                          LASHANN DEARCY HALL
                                                    United States District Judge

15